UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CARBON CREST, LLC, a Delaware Limited Liability Company,<br><br>Plaintiff,<br><br>v.<br><br>TENCUE PRODUCTIONS, LLC, a California Limited Liability Company; JEFFREY D. WILK, an individual; and DOES 1–10,<br><br>Defendant. | No. C19-08179 WHA<br><br>**ORDER DENYING MOTION TO DISMISS** |

## INTRODUCTION

In this contract action, defendants allegedly hired plaintiff to assist in selling defendant company, then reneged when it came time to pay. Defendants' Rule 12(b)(6) motion is **DENIED**.

## STATEMENT

Plaintiff Carbon Crest, LLC is a Delaware limited liability company founded and managed by Paul Lewis. Defendant Tencue Productions, LLC, an event-production and consulting company, is a California limited liability company founded and managed by defendant Jeffrey Wilk and his life-partner (Compl. ¶¶ 12–15).

Lewis and Wilk initially developed a business relationship centered on a different agreement three years before the agreement at issue. In the prior agreement Tencue placed Lewis on a monthly retainer for advisory work. As part of this business advisory relationship, Lewis recommended creation of a formal board of directors on which Lewis sat as a member until asked to resign (*id.* at ¶¶ 23, 43). Early in 2017, Wilk discussed with Lewis the fact that

Opus Agency offered $20 million dollars to purchase Tencue. They agreed that Lewis' company, Carbon Crest, should handle negotiations with Opus Agency to maximize Tencue's purchase price (*id.* at ¶ 33).

On July 31, 2017, Carbon Crest and Tencue entered into the written agreement now at issue, the Sale Process Advisory Agreement, wherein Carbon Crest agreed to provide advisory services including negotiating and maximizing the value of Tencue for its sale, managing the sale process, and evaluating other potential buyers other than the primary buyer Opus Agency (*id.* at ¶ 34). The agreement entitled Carbon Crest to compensation upon the sale of Tencue based on its enterprise value at the completed sale. The agreement provided that if Opus Agency acquired Tencue, then Carbon Crest became entitled to seven percent of the enterprise value up to $25 million dollars, and 30% of the enterprise value over $25 million dollars. If any other buyer acquired Tencue, then Carbon Crest became entitled to ten percent of the enterprise value up to $25 million dollars and 30% of the enterprise value over $25 million dollars (*id.* at ¶ 35; Exh. A at 1).

Carbon Crest and Tencue agreed to open the sales process to buyers other than Opus Agency in order to acquire a higher purchase price. Accordingly, Carbon Crest worked with an investment banking service to draft a confidential information memorandum to market Tencue. A third party then expressed interest to purchase Tencue, and Carbon Crest negotiated a purchase price of $40 million dollars with that party. Wilk, however, declined this offer (*id.* at ¶¶ 38–42).

Shortly thereafter, according to Carbon Crest, Tencue asked Lewis to resign from its board for the ulterior purpose of hiding information, removing Lewis's information rights, and cheating Carbon Crest out of the compensation owed to it under the agreement. Tencue also informed him it cancelled their initial advisory contract, then notified him of its intent to terminate the Sale Process Advisory Agreement, stating that it believed "sale of T[encue] was not appropriate 'now or in the near future.'" Less than three months later, however, Wilk notified Carbon Crest of its intent to sell Tencue. At this point Wilk refused to provide specific information about the sale, including any enterprise valuation or deal structure, but offered

1  Carbon Crest one million dollars to release Tencue from the Sale Process Advisory Agreement.
2  In addition to this, Wilk stated that if Carbon Crest did not accept his one million dollar offer,
3  then he would pull out of the sale and wait for the Sale Process Advisory Agreement to expire
4  on its own. Carbon Crest never alleges whether it accepted or declined Wilk's one million
5  dollar offer, but this order assumes it did not accept (i*d.* at ¶¶ 43–47).

On September 19, 2019, months after the above notifications, Opus Agency announced its acquisition of Tencue for an amount unknown to Carbon Crest, who then filed the instant complaint. Carbon Crest still remains uncompensated for the sale (*id.* at ¶¶ 49–50). Defendants now move to dismiss the complaint.

**ANALYSIS**

To survive a motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007). A claim has facial plausibility when the plaintiff pleads factual content that allows the district court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The district court accepts as true well-pled factual allegations in the complaint and construes the pleadings in the light most favorable to the nonmoving party. *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1030–31 (9th Cir. 2008).

The contract at issue contains a choice-of-law provision for Delaware law. Carbon Crest stands on the contract and its validity. Because a motion to dismiss is based on the complaint, Delaware law governs the contract issues in this order. Federal law still governs all procedural requirements.

**1.    BREACH OF CONTRACT CLAIM.**

"[T]o survive a motion to dismiss for failure to state a breach of contract claim, the plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *Connelly v. State Farm Mutual Automobile Ins. Co.*, 135 A.3d 1271, 1279 n.28 (Del. 2016) (internal citations and quotations omitted).

3

*First*, in addition to providing the written agreement, our complaint here alleges "Tencue . . . entered into a written contract with [Carbon Crest] to provide advisory services in connection with representing [Tencue] in a potential sale transaction []the 'Sale Process Advisory Agreement'" and again alleges that "Carbon Crest entered into a written contract with Tencue, whereby [Carbon Crest] was to provide advisory services including . . . negotiating and maximizing the value of [Tencue] at sale" (Compl. ¶¶ 2, 34, 53; Exh. A).

*Second*, the complaint alleges that "[d]espite [Carbon Crest] performing all of its obligations, T[encue] unjustifiably and improperly breached the [a]greement by failing to provide [Carbon Crest] with contractual compensation after [Tencue] was acquired by Opus Agency in September[,] 2019" (*id.* at ¶ 56). It specifically alleges a breach occurred when Tencue informed Carbon Crest it "was terminating the Sale Process Advisory Agreement, stating that the[c]ompany believed a sale of T[encue] was not appropriate 'now or in the near future'" (*id.* at ¶ 45). It further alleges that "less than three months after [Tencue stated it would not sell] . . . W[ilk] emailed C[arbon] C[rest] stating that W[ilk] and T[encue] were again considering selling the [c]ompany" and "refused to provide specific information regarding the sale transaction." He offered instead one million dollars to terminate the agreement and threatening to "wait for [Carbon Crest's] contract to term out" if Carbon Crest refused the one million dollars (*id.* at ¶ 47). The complaint alleges Wilk made this threat a second time and again "improperly refused to provide relevant information regarding the enterprise value of the transaction or its structure" (*id.* at ¶ 48). Moreover, the complaint alleges that "[o]n or about September 19, 2019, Opus Agency announced its acquisition of T[encue]" and that "Tencue never compensated Carbon Crest for its work under the [a]greement or the value that C[arbon] C[rest] created negotiating the substantial increase in T[encue]'s valuation to potential buyers" (*id.* at ¶¶ 49–50).

*Third*, the complaint alleges compensatory damages to Carbon Crest "in an amount to be determined at trial" as a result of Tencue's and Wilk's breach (*id.* at ¶ 57). The complaint alleges that "upon a completed sale transaction with Opus Agency or a related entity or affiliate, [Carbon Crest] would be compensated seven percent of the enterprise value up to $25

4

million, and 30% of the enterprise value over and above $25 million. If the sale was with any other buyer . . . [Carbon Crest] would be compensated ten percent of the enterprise value up to $25 million, and 30% of the enterprise value over and above $25 million" (*id.* at ¶ 4). Carbon Crest not only alleges the percent rates to be used for calculating its compensation but also provides the Sale Process Advisory Agreement signed by both Tencue and Carbon Crest with those percentage rates listed (*id.* at ¶ 35; Exh. A).

Thus, the motion to dismiss the breach of contract claim is **DENIED**.

### 2. BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING CLAIM.

"The implied covenant is inherent in all contracts and is used to infer contract terms to handle developments or contractual gaps that the asserting party pleads neither party anticipated. It applies when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected. The reasonable expectations of the contracting parties are assessed at the time of contracting." *Dieckman v. Regency GP LP*, 155 A.3d 358, 367 (Del. 2017) (internal citations and quotations omitted). Parties "are liable for breaching the covenant when their conduct frustrates the 'overarching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Dunlap v. State Farm Fire & Cas. Co.*, 878 A.2d 434, 442 (Del. 2005) (internal citations omitted). Thus, our complaint must allege that a contract exists and that Tencue and Wilk acted arbitrarily or unreasonably to frustrate Carbon Crest's receipt of the fruits of the agreement, monetary compensation.

*First*, in addition to providing the written agreement, our complaint here alleges "Tencue . . . entered into a written contract with [Carbon Crest] to provide advisory services in connection with representing [Tencue] in a potential sale transaction []the 'Sale Process Advisory Agreement'" (Compl. ¶ 2; Exh. A; *see also* Compl. ¶¶ 34, 53). Therefore, the complaint sufficiently alleges the existence of a contract.

*Second*, our complaint alleges Tencue and Wilk acted arbitrarily or unreasonably when Wilk offered Carbon Crest one million dollars to release Tencue's obligations under the agreement. The complaint alleges that during this offer Wilk threatened to "pull out [of the

sale] and wait for [Carbon Crest's] contract to term out" unless Carbon Crest accepted the one million dollar buyout "thereby denying [Carbon Crest] of its due proceeds under the [a]greement" (Compl. at ¶ 47). Indeed, the complaint further alleges that Wilk "improperly refused to disclose the enterprise valuation or deal structure for the sale transaction, which would impact the amount due and payable to [Carbon Crest] under the [a]greement" thereby frustrating Carbon Crest's receipt of the fruits of the agreement, monetary compensation (i*bid.*). Moreover, the complaint alleges that Tencue "breached the covenant of good faith and fair dealing by depriving [Carbon Crest] of the benefits of its efforts and services regarding [Carbon Crest's] assistance in representing [Tencue] in a sale transaction" (*id.* at ¶ 61). It further alleges that Tencue's "conduct made it impossible for [Carbon Crest] to benefit from its work on behalf of T[encue] and contributions made to [Tencue and Wilk]" (*ibid.*). Thus, Carbon Crest sufficiently pleads unreasonable or arbitrary conduct by Tencue and Wilk that frustrated the fruits of the bargain Carbon Crest reasonably expected, monetary compensation.

Therefore, the motion to dismiss the breach of the implied covenant of good faith and fair dealing claim is **DENIED**.

### 3. QUASI-CONTRACT CLAIMS.

Rule 8(d)(2) provides that a "party may set out 2 or more statements of a claim or defense alternatively or hypothetically, either in a single count or defense or in separate ones. If a party makes alternative statements, the pleading is sufficient if any one of them is sufficient." Rule 8(d)(3) provides that a "party may state as many separate claims or defenses as it has, regardless of consistency." Thus, Carbon Crest may plead in the alternative regardless of consistency. Under its alternative argument, the contract is deemed unenforceable and therefore Delaware law would not necessarily apply. This order nevertheless applies Delaware law, though it does not appear that California law would require any different result at the pleading stage.

#### A. Unjust enrichment.

"Unjust enrichment is the unjust retention of a benefit to the loss of another, or the retention of money or property of another against the fundamental principles of justice or

6

equity and good conscience. The elements of unjust enrichment are: (1) an enrichment, (2) an impoverishment, (3) a relation between the enrichment and impoverishment, (4) the absence of justification, and (5) the absence of a remedy provided by law." *Nemec v. Shrader*, 991 A.2d 1120, 1130 (Del. 2010) (internal citations and quotations omitted).

Carbon Crest contends that the complaint adequately pleads these elements. Our complaint pleads an enrichment, impoverishment and a relation between the two when it pleads that "Tencue . . . entered into a written contract with [Carbon Crest] to provide advisory services in connection with representing [Tencue] in a potential sale transaction []the 'Sale Process Advisory Agreement.'" It additionally alleges that on "September 19, 2019, Opus Agency announced its acquisition of T[encue]," and that "T[encue] never compensated C[arbon] C[rest] for its work under the [a]greement." Moreover, plaintiff alleges that "[d]espite [Carbon Crest] performing all of its obligations, T[encue] unjustifiably and improperly breached the [a]greement by failing to provide [Carbon Crest] with contractual compensation after [Tencue] was acquired by Opus Agency in September[,] 2019." It remains clear that our complaint sufficiently pleads the first four elements (Compl. ¶¶ 2, 45–50, 56, 64–66).

According to Carbon Crest, the relationship between it and Tencue remains governed by a valid written contract. It pleads, however, in the alternative that to "the extent that [Tencue and Wilk] claim that the [a]greement . . . was invalid or unenforceable, [Carbon Crest] pleads in the alternative that [Tencue and Wilk] still owe compensation to [Carbon Crest]" (*id.* at ¶ 64). So, the complaint properly pleads the fifth requirement: That absent an unjust enrichment claim Carbon Crest will have no remedy to recover the benefit wrongfully deprived of it, monetary compensation.

Thus, the motion to dismiss the unjust enrichment claim is **DENIED**.

### B. Quantum meruit.

*Quantum meruit* "allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Petrosky v.*

7

*Peterson*, 859 A.2d 77, 79 (Del. 2004).

*First*, our complaint alleges Carbon Crest performed advisory services purposed to sell Tencue with the expectation that Tencue would pay for those services. In support of this, it provides the written agreement signed by Tencue and Carbon Crest including these duties and terms. The complaint, in addition, alleges that "after several months of discussions and negotiations with W[ilk] regarding the terms of [the agreement], C[arbon] C[rest] entered into a written contract with T[encue], whereby [Carbon Crest] was to provide advisory services including . . . negotiating and maximizing the value of [Tencue] at sale, managing the sale process, as well as evaluating and exploring other potential buyers." So, the complaint alleges an expectation of payment for services Carbon Crest rendered (Compl. ¶ 34; Exh. A).

Carbon Crest also alleges it "performed all its legal obligations and conducted negotiations with Opus Agency, and also conducted their own research on the fair value and market comparable for the T[encue] transaction" and "advised and agreed with T[encue] to open the sales process to other potential buyers." The complaint additionally alleges that Carbon Crest "worked closely with [an investment banking service] to draft a confidential information memorandum . . . to market [Tencue] to prospective buyers." The complaint, moreover, alleges that Carbon Crest "was able to negotiate a $40 million enterprise valuation for" Tencue from an interested third party. Therefore, the complaint properly alleges Carbon Crest performed the service of acquiring a buyer with the expectation that Tencue and Wilk would pay for them upon a completed sale (Compl. ¶¶ 34–42, 68–69; Exh. A).

*Second*, the complaint alleges Tencue and Wilk should have known Carbon Crest expected to be paid when it alleges that "T[encue] requested, by words or conduct, that [Carbon Crest] perform advisory services as a private equity professional for the benefit of [Tencue and Wilk], as memorialized in the Sale Process Advisory Agreement." It additionally supplies the written agreement between Tencue and Carbon Crest that states Carbon Crest would render advisory services to help sell Tencue, payable only upon sale of Tencue (Compl. ¶ 68; Exh. A). Therefore, the complaint also sufficiently alleges that Tencue and Wilk should have known that Carbon Crest expected to be paid upon execution of a sale.

8

Thus, the motion to dismiss the claim for *quantum meruit* is **DENIED**.

### C. Promissory estoppel.

"To prevail on a promissory estoppel claim, a plaintiff must establish that: (i) a promise was made; (ii) it was the reasonable expectation of the promisor to induce action or forbearance on the part of the promisee; (iii) the promisee reasonably relied on the promise and took action to his detriment; and (iv) such promise is binding because injustice can be avoided only by enforcement of the promise." *Harmon v. State, Delaware Harness Racing Comm'n*, 62 A.3d 1198, 1200–01 (Del. 2013) (internal citations and quotations omitted).

Our complaint alleges that "C[arbon] C[rest] entered into a written contract with T[encue], whereby [Carbon Crest] was to provide advisory services including . . . negotiating and maximizing the value of [Tencue] at sale" as memorialized in the agreement. It also alleges Carbon Crest "would be compensated based on the enterprise value of a completed sale transaction" at the rates delineated in the agreement. The complaint additionally alleges that Tencue and Wilk "made these representations with the intention that [Carbon Crest] would rely on them and provide advisory services relating to the sale process of [Tencue] in exchange for contingent compensation which would only be paid upon a completed sale." So, the complaint alleges that Tencue and Wilk promised monetary compensation at a rate determined in the written agreement upon the sale of Tencue for Carbon Crest's assistance in selling Tencue. Therefore, the complaint sufficiently alleges the first two elements: That Tencue and Wilk made a promise with the reasonable expectation of inducing Carbon Crest to action (Compl. ¶¶ 34, 35, 37, 68).

Our complaint also alleges that Carbon Crest "reasonably relied on these representations because of [its] prior work with [Tencue and Wilk] and because of [Tencue's and Wilk's] business reputation." It additionally alleges that Carbon Crest "performed all its legal obligations and conducted negotiations with Opus Agency, and also conducted their own research on the fair value and market comparable for the T[encue] transaction" and "advised and agreed with T[encue] to open the sales process to other potential buyers." In addition, the complaint alleges that Carbon Crest "worked closely with [an investment banking service] to

9

draft a confidential information memorandum . . . to market [Tencue] to prospective buyers." It, moreover, alleges that Carbon Crest "negotiate[d] a $40 million enterprise valuation for" Tencue from an interested third party. So, Carbon Crest alleges it negotiated with Opus Agency and the interested third party, coordinated with an investment banking company, and successfully rendered a $40 million dollar offer to purchase Tencue. Therefore, the complaint adequately alleges the third element, that Carbon Crest reasonably relied on Wilk's and Tencue's promise to its detriment (Compl. ¶¶ 37–39, 41).

Lastly, the complaint alleges Tencue breached the agreement by "failing to provide [Carbon Crest] with contractual compensation." It, additionally, provides the written contract with the duties and terms for Carbon Crest's role in Tencue's sale, the rate of compensation owed Carbon Crest upon Tencue's sale, and signatures by both Tencue and Carbon Crest. Thus, the complaint also sufficiently alleges the fourth element: That Tencue's and Wilk's promise to pay for Carbon Crest's services is binding (Compl. ¶ 56; Exh. A).

Thus, the motion to dismiss the *promissory estoppel* claim is **DENIED**.

\* \* \*

As stated at the hearing, a fair issue exists whether the contract really is enforceable under Section 144 of the Delaware General Corporation Law, given that Lewis was a board member and was by default "interested" in the agreement. Whether this agreement fails on that ground (or Section 310 of the California Corporations Code) ought to be made after an opportunity for discovery and a prayer motion for summary judgment can be made, failing which, it will be decided at trial.

**CONCLUSION**

The motion to dismiss is **DENIED**.

**IT IS SO ORDERED.**

Dated: March 20, 2020.

_____
WILLIAM ALSUP
United States District Judge

10