1
2
3
4
5
6                    UNITED STATES DISTRICT COURT
7
8                    NORTHERN DISTRICT OF CALIFORNIA
9
10   CARBON CREST, LLC,
11           Plaintiff,                        No.  C 19-08179 WHA
12       v.
13   TENCUE PRODUCTIONS, LLC, and        **FINDINGS OF FACT AND**
     JEFFREY D. WILK,                    **CONCLUSIONS OF LAW**
14                                        **AFTER BENCH TRIAL**
             Defendants.
15
16
17                        **INTRODUCTION**
18       In this diversity action, plaintiff seeks payment under a contract.  This order follows a
19   four-day bench trial.
20                          **SUMMARY**
21       At all material times, defendant Tencue Productions was a California limited liability
22   company that provided event production services to other companies.  Defendant Jeffrey D.
23   Wilk, a fifty-percent shareholder and board member of Tencue, sought to sell Tencue.  In July
24   2017, Tencue entered into an agreement with plaintiff Carbon Crest, a Delaware limited
25   liability company, under which Carbon Crest would "assist with representing [Tencue] in a
26   potential sale transaction."  The sole owner of Carbon Crest, Paul Lewis, was Tencue's
27   financial advisor and a Tencue board member at the time of the agreement.  Lewis signed the
28   agreement on behalf of Carbon Crest, and Wilk signed the agreement on behalf of Tencue.

United States District Court
Northern District of California

1    The agreement provided that, if a sale of Tencue occurred within 36 months of the agreement's

2    termination, Tencue would pay Carbon Crest a percentage of the sale price.  Tencue terminated

3    the agreement, and Tencue was sold six months later.  But Tencue and Wilk refused to pay

4    under the agreement.  This order concludes the agreement was void, so plaintiff may not

5    recover in contract.  But plaintiff may recover in quasi-contract.  Defendants shall not recover

6    on their counterclaims.

7                                    **PROCEDURAL HISTORY**

8         Plaintiff commenced this action in December 2019, alleging breach of contract and

9    equitable claims.  Defendants answered with several affirmative defenses, including lack of a

10   required license and failure to ratify an interested director transaction.  Defendants also made

11   several counterclaims, including breach of fiduciary duty and professional negligence.

12        Defendants moved to dismiss plaintiff's claims under FRCP 12(b)(6), but a prior order

13   denied the motion as to all claims.  Defendants later filed a motion for summary judgment,

14   which a prior order denied due to an abundance of genuine disputes of material fact.

15        This order follows a four-day bench trial that commenced on Monday, March 7, 2022.

16   Following the close of evidence, both sides submitted proposed findings of fact and

17   conclusions of law, followed by responses (Dkt. Nos. 129–32).  Closing arguments were heard

18   on the morning of March 10.

19        Rather than vet each and every finding and conclusion proposed by the parties, this order

20   navigates its own course through the evidence and arguments.  Yet many of the parties'

21   proposals have found their way into this order.  Any proposal that has been expressly agreed to

22   by the opposing side is deemed adopted (but only to the extent agreed upon), even if not

23   expressly adopted herein.

24        All declaratory statements set forth in these findings of fact are factual findings.  In the

25   findings, the phrase "this order finds . . ." is occasionally used to emphasize a point.  The

26   absence of that phrase, however, does not mean (and should not be construed to mean) that a

27   statement is not a finding.

28

United States District Court
Northern District of California

2

It is unnecessary to cite the record for all of the findings herein.  Citations are provided only as to particulars that may assist the court of appeals.

## FINDINGS OF FACT

1.      Paul Lewis earned a Master of Business Administration at UCLA.  Lewis worked at investment banks and private equity funds after earning his MBA, where he gained experience with multi-million dollar transactions.

2.      Tencue Productions was a California limited liability company with its principal place of business in Berkeley, California.  From Tencue's formation until its sale, defendant Jeffrey D. Wilk owned fifty percent of all shares of Tencue, and Kristin Leimkuhler owned the remaining fifty percent.  Leimkuhler was Wilk's life partner.  Wilk and Leimkuhler lived together in California at the time of all events discussed herein.  Wilk and Leimkuhler were the only two directors on Tencue's board prior to November 2015.  Tencue coordinated and managed events, such as product unveilings, for other companies.

### THE BUSINESS ADVISORY AGREEMENT

3.      In July 2014, Lewis emailed Wilk to introduce himself and discuss a potential business arrangement.  At that time, Lewis and his colleague operated a limited liability company called Tribula Group.  Lewis then lived in California.  Lewis had not yet formed Carbon Crest, LLC.

4.      Tribula Group was a search fund, the goal of which was to find a company with potential for growth, maximize the value of the company, and then acquire the company.  That process had two stages.  *First*, the search fund raised capital from investors, which the search fund used to find and meet with companies.  *Second*, the search fund chose a company to work with, and the search fund helped the company grow.  At an appropriate time, the search fund acquired the company.

5.      Lewis approached Wilk with the goal of maximizing Tencue's value and ultimately acquiring Tencue.  To that end, Lewis eventually formed an agreement with Tencue called the Business Advisory Agreement in October 2014.  At the time of the agreement, Wilk knew it was Lewis' intention to eventually acquire Tencue.  Lewis was living in San Francisco

United States District Court
Northern District of California

United States District Court
Northern District of California

when he and Wilk executed the agreement.  Lewis signed the agreement in his individual capacity.  Wilk signed the agreement on behalf of Tencue.

6.      Under the Business Advisory Agreement, Lewis was to provide advisory services to Tencue, including assisting with company operations, company finances, and any potential acquisitions by Tencue.  Lewis did not have a duty to assist with a potential sale of Tencue to another company.  Much of Lewis' time was spent on site working day-to-day with the other employees and officers.

7.      There was no termination date for the Business Advisory Agreement, but either party could terminate the agreement at any time and for any reason by providing the other party with ten-days' notice.  Under the agreement, Lewis earned $6,250 per month in exchange for working one week per month.  In September 2015, Wilk agreed to raise Lewis' pay to $15,000 per month, and Lewis agreed to work two weeks per month thereafter.  In total, Tencue paid Lewis approximately $728,000 under the Business Advisory Agreement from October 2014 to February 2019 — when Tencue terminated the agreement.  Lewis earned this money apart from his services relating to the sale of Tencue, which are discussed below.

### FIRST OPUS OFFER AND THE SALES PROCESS ADVISORY AGREEMENT

8.      The two shareholders had a general interest in selling the company, and Lewis had a general interest in buying the company, general interests known to all concerned.  There was not, however, any duty to sell or buy.  In November 2015, Lewis advised Wilk to expand Tencue's board of directors.  Wilk agreed, as his goal was to shift some of the company's day-to-day operational decisions to others.  On November 23, 2015, Lewis joined the board of directors.  Miriam Agrell, Tencue's Chief Executive Officer, and Kavita Vora, Tencue's Chief Operating Officer, both long-term employees, joined the board around the same time.

9.      Tencue's board of directors never had a practice of formal voting.  With the exception of one instance when the board provided unanimous written consent for an employee profit-sharing plan, there was no formal vote for any decision.  Rather, all the board members acknowledged and adhered to a practice whereby Wilk, alone, made the significant decisions on behalf of Tencue.

United States District Court
Northern District of California

10.      Lewis moved to New York at the beginning of 2016.  He never resided in California thereafter, but he maintained an address in California.  He moved to Florida at the end of 2017.

11.      In the summer of 2016, Lewis proposed a debt-financed management buyout of Tencue, whereby all five directors would have received equity stakes in Tencue.  But because the management buyout would have encumbered Tencue with debt, Wilk, alone, rejected the proposal in March 2017.  There was no board vote on the management buyout.

12.      In May 2017, Opus Agency, an Oregon corporation, reached out to Tencue to discuss an offer to purchase Tencue.  Wilk was interested in the offer.  Vora asked Lewis to help with the Opus Agency transaction.  Although Lewis was surprised because he had intended to acquire Tencue himself rather than to assist in its sale to another entity (and realized Wilk so understood), Lewis agreed to assist in a sale transaction.

13.      In late May 2017, Lewis emailed Vora and requested separate compensation from Tencue in exchange for his assistance with the potential sale of Tencue.  Wilk and Vora discussed Lewis' request.  Thereafter, Vora sent an email to all five board members, including Lewis, stating that Wilk and Lewis should have a conversation to discuss separate compensation.

14.      Lewis sent a proposal to Wilk, which provided to Lewis a flat fee between ten and fifteen percent of the sale price.  Wilk made a counterproposal for tiered compensation.  Wilk and Lewis negotiated for two months, and neither of them consulted an attorney.

15.      Lewis had formed Carbon Crest in December 2014.  Lewis had been the sole owner of Carbon Crest since its formation.  Neither Lewis nor Carbon Crest ever had any professional licenses.

16.      Lewis decided to use Carbon Crest as the vehicle for carrying out his end of the new agreement.  Wilk, on behalf of Tencue, and Lewis, on behalf of Carbon Crest, signed a Sales Process Advisory Agreement in California on July 31, 2017, just as only those two had signed the earlier agreement.  Tencue's board of directors never voted to approve either agreement.  Likewise, Tencue's shareholders never voted to approve either agreement.

5

1

2

3

4

17.    Vora knew that Lewis and Wilk had had a conversation about additional compensation.  Moreover, Vora knew that the compensation was contingent on the sale of Tencue, and she knew that at least one term Lewis and Wilk had agreed to was a ten percent rate.  Vora, however, never asked Wilk about the specific terms of the agreement.

18.    In late 2017, Wilk told Agrell that he and Lewis had an agreement to compensate Lewis upon a sale of Tencue.  Agrell never knew there was a written contract.  Agrell never asked whether there was a written contract, and Agrell never asked about its terms.

19.    Shareholder and board member Leimkuhler was also aware that Lewis and Wilk were negotiating additional compensation for Lewis.  Leimkuhler and Wilk lived together and were life partners.  Wilk told Leimkuhler (1) the compensation would be contingent on the sale of Tencue, and (2) the contingent payment would be determined on a percentage basis. Leimkuhler did not discourage Wilk from entering into the agreement with Lewis, nor did she object to the agreement.  Leimkuhler never asked Wilk about the other terms of the agreement. Nor did she ask to see a copy.

20.    As a pattern and practice, Leimkuhler trusted Wilk to make all major business decisions and permitted him to do so.  All board members were aware of this practice. Generally, Wilk did not keep Leimkuhler informed regarding all major business decisions. But, if Leimkuhler wished to be informed about business matters, Wilk informed her to the full extent that she so wished.  Leimkuhler was free to ask Wilk about such business matters at any time, especially because Leimkuhler and Wilk lived together.

21.    At trial, Leimkuhler tried to testify that she did not have knowledge of the contingent fee in the Sales Process Advisory Agreement.  This was in direct contradiction of her deposition testimony.  Her attempt to contradict her deposition testimony was unreasonable and false.  Her trial testimony was part of a contrived set of talking points for trial not grounded in the truth.

22.    The Sales Process Advisory Agreement provided that Carbon Crest would "assist with representing [Tencue] in a potential sale transaction."  It also stated that Tencue had already been approached by Opus Agency, and Tencue was "looking to maximize its value and

6

find an acquirer that can offer interesting new opportunities for Jeffrey Wilk and the

management team."  Carbon Crest's express duties under the agreement were as follows:

- Evaluate other potential buyers to provide additional sale options for [Tencue] to explore.

- Negotiate and maximize value.

- Negotiate favorable non-price related acquisition terms and conditions (e.g., escrow, reps & warranties, terms of any deferred compensation, etc.).

- Negotiate an acquisition structure attractive to [Tencue] (i.e., post-acquisition operations, decision making, management roles, new opportunities, etc.).

- Negotiate the post-acquisition conditions and compensation packages for [Tencue's] management and employees.

- Manage the sale process through to the transaction closing date, and assist with the determination of any deferred payment calculations if applicable.

The agreement further stated that Tencue "shall compensate [Carbon Crest] based on the

enterprise value of a completed transaction, as follows":

- If with Opus Agency or a related entity or affiliate:

  ○ Seven percent of the enterprise value up to $25m, and

  ○ 30% of the enterprise value over and above $25m.

- If with any other buyer:

  ○ Ten percent of the enterprise value up to $25m, and

  ○ 30% of the enterprise value over and above $25m.

The agreement also provided that Carbon Crest "has arranged for a banking partner to support

the deal process under a fee structure of one percent of the enterprise value up to $30m, and

four percent of the enterprise value over and above $30m."  It further stated that Carbon Crest

would "cover 50% of the banking partner's fee for any amounts relating to enterprise value

over $30m."

23.     Contingent fee rates for brokers are normally between one and five percent of the total transaction value.  It was Lewis who advised Wilk to hire a banking partner.  AdMedia Partners, Inc., a New York corporation, was the banking partner Tencue selected.  AdMedia served as the frontline of negotiations with Opus Agency (and other potential buyers discussed below).

24.     Lewis participated in negotiations with potential buyers, but he did not do so within California.  All negotiations with potential buyers took place in New York.  His work in California under the Sales Process Advisory Agreement concerned only informational and cultural integration meetings between Tencue and potential buyers.

25.     Under the Sales Process Advisory Agreement, Tencue had "no obligation to pursue a transaction with Opus or any other buyer . . . ."  Either party could terminate the agreement at any time by providing written notice to the other party.  Tencue was obligated to pay Carbon Crest upon any sale of Tencue within 36 months of the agreement's termination.

26.     The agreement (¶ 11) provided that it would be "governed by, construed and interpreted in accordance with the internal laws of the State of Delaware, without giving effect to principles of conflicts of laws."

27.     During the sale discussions between Opus Agency and Tencue, Lewis had been in contact with Scott Peters, a managing partner at an investment firm that owned Opus Agency.  At trial, Peters described his interactions with Lewis as frustrating and difficult.  Based on the overall trial evidence, this order disagrees with Peters' characterization of those interactions.  Lewis made reasonable requests for financial information that would help him assess Opus Agency's valuations of Tencue, but Peters refused to provide such information.  Peters disagreed with Lewis' $89 million valuation of Tencue, but Peters did not fully explain his own $25 million valuation.

28.     Opus Agency offered $20 million to buy Tencue.  In the negotiations, Opus Agency increased the offer to $25 million.  Wilk was prepared to accept both offers.  But Lewis recommended that Wilk reject both offers because he believed Tencue could receive better offers from other potential buyers.  Thanks to Lewis, Wilk rejected both offers.

United States District Court
Northern District of California

1

**NTH DEGREE AND OTHER POTENTIAL BUYERS**

2       29.     Tencue then opened the bidding to other companies.  Lewis began looking for and

3   researching potential buyers, and he created an "Information Memorandum" to provide to

4   potential buyers, which included a financial projection for 2017 and other detailed information

5   about Tencue.  To engage with potential buyers, Lewis, Wilk, and Leimkuhler attended

6   approximately ten "roadshow meetings."  All but two of these meeting were held at AdMedia's

7   office in New York (the other two meetings were in San Francisco and Washington, D.C.).  All

8   the roadshow meetings were largely educational; the goal was for both Tencue and the

9   potential buyers to learn about one another.  Lewis provided Wilk and Leimkuhler with

10  information specific to each potential buyer, and Lewis created model answers to help Wilk

11  and Leimkuhler answer potential questions about Tencue at the meetings.  Lewis advised Wilk

12  and Leimkuhler to deflect questions about Tencue's valuation.  Wilk and Leimkuhler handled

13  most of the discussions at the meetings while Lewis handled in-depth financial questions.

14      30.     Lewis wanted to make Tencue's financials presentable to potential buyers.  Thus,

15  he also worked with a New York accounting firm to convert Tencue's cash-based accounting

16  system to one compliant with Generally Accepted Accounting Principles.  A full conversion

17  proved difficult, so Lewis instead implemented an "overlay conversion."  From then on,

18  Tencue was "effectively running two accounting systems," which required Lewis' continuous

19  supervision to ensure that any errors were corrected.

20      31.     In August 2017, Lewis informed Wilk of the existence of Nth Degree, Inc., a

21  Georgia corporation that managed trade shows and events.  Nth Degree was actively seeking to

22  buy a company in the trade show or event industries at the time.  Tencue was in the event line

23  of work.

24      32.     Wilk said he would consider negotiating with Nth Degree if sale discussions

25  could "establish a baseline valuation."  Lewis affirmed that sale discussions with Nth Degree

26  could "be helpful from a process/valuation standpoint."  Lewis also stated that he could arrange

27  an initial conversation between Tencue and Nth Degree "to explore fit."  Wilk affirmatively

28  told Lewis to initiate preliminary discussions with Nth Degree.

9

United States District Court
Northern District of California

33.     In October 2017, Wilk, Leimkuhler, and Lewis attended a meeting in New York with principals from Nth Degree, including Chief Executive Officer Richard Ennis.  Lewis prepared a "Confidential Information Memorandum" to inform Nth Degree's principals as to Tencue's financial status.  Thereafter, Wilk and Agrell had further discussions and meetings with Nth Degree principals.  Lewis arranged all meetings between Tencue and Nth Degree, which proved difficult because Tencue's principals often requested schedule changes and cancellations.  Lewis did an excellent job managing the sale process, arranging meetings, preparing financials, handling paperwork, and shepherding the process along.

34.     During a meeting in New York in December 2017 between Tencue and Nth Degree's respective principals, the parties discussed the cultural fit between Tencue and Nth Degree.  Lewis was the one who suggested that this cultural-fit meeting occur.  Lewis personally set up the meeting with the intent to facilitate discussions regarding the companies' cultural compatibility.  Wilk and Agrell knew Lewis' intention, and the parties discussed cultural fit at the meeting.

35.     In January 2018, Tencue and Nth Degree signed a letter of intent to sell Tencue to Nth Degree.  The letter provided that Nth Degree would pay Tencue:  $25 million in cash; a five million dollar earnout based on profits from an Nth Degree event later in 2018; and $7.5 million in rollover participation, which consisted of stock in Nth Degree.  This offer was legitimate and substantially comparable to a $37.5 million cash offer.

36.     Before and after the signing of the letter of intent, Lewis supported Wilk's desire to find a company that had a good cultural fit with Tencue.  There were three subsequent integration meetings in February and March 2018 to discuss the extent to which Nth Degree and Tencue's cultures matched.  One of those meetings took place in California.

37.     At one of those integration meetings, Nth Degree CEO Ennis informed Wilk of Nth Degree's ties to a particular trade show called the "Shooting, Hunting, Outdoor Trade Show."  No principal from Tencue, including Lewis, had known about the SHOT Show prior to that meeting.  There is no evidence that the show featured anything other than lawful firearms.  There is no evidence that it involved high-capacity magazines or automatic weapons.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

38.     The SHOT Show, which was essentially a gun show, was one of thousands of various trade shows with which Nth Degree had ties.  Briefly, Nth Degree had two divisions: a trade show division and an events division.  One customer within its trade show division hosted the SHOT Show.  Thus, the SHOT Show would have been two steps removed from Tencue upon a sale to Nth Degree:  (1) Tencue would have been within Nth Degree's events division while the SHOT Show would have remained within Nth Degree's trade show division; and (2) Nth Degree's trade show division did not host the SHOT Show itself, but rather a unique entity within the trade show division hosted the show.

39.     Despite this attenuated connection between Tencue and the SHOT Show, Wilk became hesitant to do business with Nth Degree.  Wilk was concerned that the SHOT Show did not fit with Tencue's corporate culture.  Lewis suggested to Nth Degree that it either drop the customer who hosted the SHOT Show or separate into two distinct businesses — one for events and one for trade shows.  Nth Degree was unwilling to do either.

40.     After the failure of integration meetings to resolve the SHOT Show issue, Wilk rejected Nth Degree's $37.5 million offer in March 2018.  The SHOT Show was Wilk's primary reason for rejecting the offer.  Tencue had every right to reject on this ground.  Lewis did not object; he supported Wilk's decision.

41.     This order disagrees with defendants' trial criticism that Lewis did not perform ample due diligence to uncover the SHOT Show sooner.  It is an unreasonable and contrived criticism, a false narrative designed for litigation, one unanchored in the truth.  Before contacting Nth Degree, Lewis told Wilk that he could arrange an initial meeting with Nth Degree to "explore fit."  Moreover, prior to the signing of the letter of intent, Lewis personally arranged a meeting for Tencue and Nth Degree to discuss cultural fit.  And the meeting was, in fact, held in New York.  Lewis supported culture integration meetings as well as Wilk's decision to reject the offer due to poor cultural fit.  That the SHOT Show was two steps removed from Tencue and only one of thousands of trade shows connected to Nth Degree makes it unreasonable to suggest now that Lewis should have uncovered the SHOT Show on his own.  In fact, Lewis did an excellent job exploring the companies' cultural fit.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

42.     In furtherance of the false narrative, Agrell testified at trial that Lewis "encouraged us very strongly to not engage the Nth Degree team on culture — specific questions around culture and values."  Agrell also testified that there were no cultural fit discussions prior to the signing of the letter of intent.  But, as the preceding demonstrates, Agrell's testimony was untrue.  There had been a cultural fit dinner in New York in December 2017, a month before the letter of intent was signed.  When Agrell was confronted with evidence contradicting her testimony, she backed up to a new criticism that the culture meeting in New York in December 2017 had been at "this loud Italian restaurant . . . it was not the place that I had in mind to sit down and talk through something that was that important," eventually admitting that the meeting did occur after all.

43.     If anyone, it was not Lewis but *Wilk* who discouraged cultural fit discussions.  In an email to Lewis regarding the upcoming culture meeting in New York in December 2017, Wilk stated:  "Dinner?  Doesn't it seem a bit premature?"

44.     Defendants' own expert stated that he, as an investment banker, always insisted that companies "go out to dinner" to discuss cultural fit.  For the defense to now say that a dinner was an inappropriate way to explore cultural fit is not credible.  It turned out, furthermore, that defense counsel had never provided the expert with the emails wherein Lewis tried hard to arrange cultural fit dinners and meetings.  Given this stacked deck provided to the expert, it is no wonder that the expert criticized Lewis on the ground that he had failed to do exactly what the withheld emails showed he had done.  It was all part of a contrived narrative to place Lewis in a false light and to pretend he had done a poor job when, in fact, his work had been excellent.

45.     The false narrative does not comport with what Agrell said at the time.  In an email to Ennis of Nth Degree after Tencue backed out, Agrell stated:

> I am also disappointed to not get a chance to work with you and the event team.  Beyond the opportunity to produce work together, it is clear to me that I could learn and grow so much thru your mentorship.  I deeply regret that that will not come to pass.

So it is clear that Agrell felt good about Nth Degree even after learning of the SHOT Show.

46.     Tencue had received two other offers.  Both potential buyers were incorporated in Delaware and had headquarters outside of California.  In November 2017, one potential buyer offered $17.5 million with two deferred earnouts.  Depending on Tencue's growth after the sale, Tencue could have received anywhere from $7.1 million to $62 million in earnout payments.  Thus, the offer represented a minimum price of $24.6 million and a maximum price of $79.5 million.  Similarly, in November 2017, a different potential buyer offered $17 million with two deferred earnouts.  Depending on Tencue's growth after the sale, Tencue could have received anywhere from $17 million to $24.5 million in earnout payments.  Thus, the offer represented a minimum price of $34 million and a maximum price of $41.5 million.  The potential buyers pulled out for concern that Tencue received fifty percent of its business from one client, and Tencue's profits were down twenty percent for the year.

**TENCUE'S STEP-WISE DISENGAGEMENT FROM LEWIS**

47.     After all of the foregoing, Tencue systematically, one step at a time, discontinued Lewis' role in the company, starting with removing him from the board and terminating his agreements, all the while praising him for his contributions.

48.     Agrell sent an email to Lewis.  Dated June 27, 2018, the email removed him from the board and read, in part:

> As you know we are taking this time post-non-sale to regroup and make sure we're charting the right course forward for Tencue as well as for [Leimkuhler] and [Wilk].  One step in being able to do this is to reconstitute the board to include only [Wilk], [Leimkuhler], [Vora], and myself.
>
> Your participation has been a tremendous asset over the last few years and, while there will no longer be a board level role available, we'd like you to stay on as a consultant to help us with financial and operational projects moving forward.

Lewis replied that he was "happy to continue to support Tencue and the team" and "confirm[ed] that [he was] no longer part of the board."  Thus, Lewis resigned from the Tencue board of directors on June 27, 2018.

49.     On February 5, 2019, Agrell emailed Lewis, stating that Tencue would soon start interviewing candidates for the position of Chief Financial Officer.  Agrell provided a list of projects that Lewis would continue working on.  Agrell also wrote:

> Your work over the past years has been very valuable to us and we're hopeful that you are open to a continued partnership in this new structure.

50.     Lewis, Agrell, and Vora discussed Lewis' new role on February 7, 2019.  On that date, Lewis informed Agrell and Vora about the specific terms of the Sales Process Advisory Agreement.  Also on that date, Agrell notified Lewis that Tencue was terminating the Business Advisory Agreement, which remained in place until the end of February 2019.

51.     In an email dated February 26, 2019, Agrell terminated Lewis' Sales Process Advisory Agreement on behalf of Tencue.  Tencue terminated the Sales Process Advisory Agreement to initiate Lewis' three-year compensation period under the agreement.  In the email, Agrell wrote, in part:

> [Wilk], [Leimkuhler], [Vora], and I appreciate all the work you have done for us in the past few years. . . . [W]e have enjoyed working with you and look forward to continuing that as our relationship winds down.

52.     Agrell's praise of Lewis in the emails above stands in stark contrast to the defense's false narrative and the board members' expressions of displeasure with Lewis at trial.

53.     Under the Business Advisory Agreement, Lewis continued working for Tencue until May 30, 2019, at a rate of $15,000 per month.

## OPUS REDUX

54.     When Tencue terminated the Sales Process Advisory Agreement, Tencue stated to Lewis that it had no expectation of selling the company.  Specifically, it told him:  "[it] do[es] not believe that a sale of Tencue is appropriate now or in the near future."  Contrary to that representation, however, Tencue was, in fact, reopening negotiations with Opus Agency.

55.     At trial, Wilk testified that, after he rejected Opus Agency's first offer in the fall of 2017, Opus Agency did not reach out to Tencue to reinitiate sale discussions until April 2019, after the termination of the Sales Process Advisory Agreement.  Wilk gave this

14

1    testimony in an apparent effort to corroborate the representation to Lewis that the board

2    members "do not believe that a sale of Tencue is appropriate now or in the near future."

3            56.     But an email from Peters of Opus Agency to Wilk on November 14, 2018, shows

4    that Wilk's testimony was not truthful.  In the email to Wilk, Peters wrote in November 2018:

5                    I heard that you might be exploring a deal and wanted to see if
                     there was any truth to that.  Opus remains interested if the
6                    opportunity and timing is right and I will keep all discussions
                     confidential.  Please let me know if you want to chat in the coming
7                    days or weeks.

8    In reply, Wilk wrote, "[l]et's find a moment to catch up next week."  This order finds that Wilk

9    and Tencue re-opened communications for a sale to Opus Agency in November 2018, contrary

10   to the false narrative presented at trial.  The problem for defendants, however, was the Sales

11   Process Advisory Agreement.  So negotiations with Opus Agency paused until defendants

12   could disengage from Lewis and the Sales Process Advisory Agreement.

13           57.     Thus, Wilk was, in fact, interested in reinitiating sale discussions with Opus

14   Agency as early as November 2018.  Wilk conveniently overlooked that email exchange in his

15   trial testimony (until it came out in cross-examination).  Based on Wilk and Peters' email

16   exchange, at least one board member (*i.e.*, Wilk) *did* believe a sale of Tencue was appropriate

17   in the near future.

18           58.     On April 23, 2019, Wilk met with Opus Agency's Chief Executive Officer,

19   Monte Wood, for dinner.  At the dinner, Wood asked whether Wilk would entertain a new

20   offer for the sale of Tencue to Opus Agency.  Wilk said yes.

21           59.     On April 30, 2019, Peters sent Wilk an offer letter.  The letter stated that "Opus

22   values Tencue at an enterprise value of $40 million."  This order finds it disingenuous for

23   Peters to state that he did not use Nth Degree's $37.5 million offer as a baseline when making

24   his offer to Tencue.  In 2018, Peters had "heard that [Wilk] might be exploring a deal," so this

25   order finds that Peters was mindful of the Nth Degree offer when reopening sale discussions

26   with Wilk.

27           60.     Tencue then asked for a price increase to $42 million.  On May 20, 2019, Opus

28   Agency agreed to the price increase.  On the same day, Wilk offered Lewis one million dollars

United States District Court
Northern District of California

15

1   to release Tencue from its obligation to pay Lewis a percentage of the final sale price.  Lewis

2   declined Wilk's offer.  Under the agreement, if valid, Tencue owed $6.85 million to Lewis.

3       61.     On May 21, 2019, Wilk signed the letter of intent for the sale of Tencue to Opus

4   Agency.  The sale was completed in August 2019.  Lewis did not perform any new work

5   related to the second Opus Agency offer and ultimate sale of Tencue to Opus.

6       62.     Agrell and Vora received $7.9 million and $2.5 million, respectively, under

7   contingent compensation agreements with Tencue.  The board of directors did not vote to

8   approve either agreement.  Lewis and Carbon Crest received nothing.

9                     **ANALYSIS AND CONCLUSIONS OF LAW**

10      This order concludes the Sales Process Advisory Agreement was void, so plaintiff may

11  not recover in contract.  But plaintiff may recover in quasi-contract.  Defendants shall not

12  recover on their counterclaims.

13      **1.     CONTRACT FORMATION AND CONSIDERATION.**

14      This order rejects the defense that Lewis' obligations under the Sales Process Advisory

15  Agreement were already required under the Business Advisory Agreement.

16      "There is general support in the California case law for the proposition that consideration

17  cannot consist of the promise to perform a preexisting duty owed to a third person."  *Cal.*

18  *Grocers Assn. v. Bank of Am.*, 22 Cal. App. 4th 205, 219 (1994).  The Sales Process Advisory

19  Agreement, however, was supported by sufficient consideration because Lewis' duties under

20  the Sales Process Advisory Agreement were different from those under the Business Advisory

21  Agreement.  Under the Business Advisory Agreement, none of Lewis' duties were related to

22  the sale of Tencue.  Although one potential duty was "organic vs. acquired expansion," this

23  referred to only acquisitions *by* Tencue.  Under the Sales Process Advisory Agreement,

24  however, Lewis' duties related to the sale of Tencue.  Those duties included:  "evaluate other

25  potential buyers;" "manage the sale process;" and "negotiate" terms.  Thus, the Sales Process

26  Advisory Agreement is not unenforceable for lack of consideration.

27

28

United States District Court
Northern District of California

16

### 2. THE CALIFORNIA LICENSING STATUTE.

California Business and Professions Code Section 10130 provides, in part:

> It is unlawful for any person to engage in the business of, act in the capacity of, advertise as, or assume to act as a real estate broker or a real estate salesperson within this state without first obtaining a real estate license from the department . . . .

Section 10131 of the Business and Professions Code provides, in part (emphasis added):

> A real estate broker within the meaning of this part is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others:
>
> (a) Sells or offers to sell, buys or offers to buy, solicits prospective sellers or buyers of, solicits or obtains listings of, or negotiates the purchase, sale, or exchange of real property *or a business opportunity*.

In *All Points Traders, Inc. v. Barrington Assocs.*, an investment banking firm contracted to assist a company in the "sale of its 'assets and/or common stock.'" Specifically, the banking firm was to "generate, screen and follow up on all leads, provide information about [the company] to qualified buyers, prepare a corporate profile of [the company] and assist in negotiations." Ultimately, the company located the purchaser, but the banking firm "identified other prospective purchasers and handled initial negotiations with some of them." 211 Cal. App. 3d 723, 727 (1989).

The final sale included a transfer of all common stock and a lease of the land where the company's office sat. *All Points* found that a broker's license is necessary to negotiate a stock sale. *All Points* recognized that the phrase "or a business opportunity" includes "the sale or lease of the business and goodwill of an existing business enterprise or opportunity." Cal. Bus. & Prof. Code § 10131. It went on to state "the definition of a 'business opportunity' does not necessarily include real property . . . ." Rather, "the sale or purchase of a 'business opportunity' encompasses any transfer of the ownership of an entire ongoing business in corporate form whether by transfer of all the stock or all the assets." *All Points*, 211 Cal. App.

3d at 728–31; *see Salazar v. Interland, Inc.*, 152 Cal. App. 4th 1031, 1039 (2007); *Meisner v. Reliance Steel & Aluminum Co.*, 273 F.2d 49, 51–53 (9th Cir. 1959).

The banking firm in *All Points*, however, never had a broker's license. Thus, *All Points* set aside an arbitration award of commissions to the banking firm under Business and Professions Code Section 10130 because the firm assisted in negotiations. 211 Cal. App. 3d at 727, 734.

### A.   THE SALE OF TENCUE WAS A "BUSINESS OPPORTUNITY."

"[O]r a business opportunity," as discussed above, "encompasses any transfer of the ownership of an entire ongoing business in corporate form whether by transfer of all the stock or all the assets." *Id.* at 731.

Here, under the Sales Process Advisory Agreement, Carbon Crest was to assist in the sale of Tencue (TX 36). Negotiations with all potential buyers envisioned stock sales, and Opus Agency eventually bought all stock in Tencue (TX 25). Thus, like in *All Points*, in which the sale of all common stock of a company constituted a business opportunity, here, the opportunity to sell Tencue constituted a business opportunity under the Business and Professions Code. And, that the sale of Tencue did not include real property does not preclude application of the statute: "[the] historical background establishes that the definition of a 'business opportunity' does not necessarily include real property, but that it may." *All Points*, 211 Cal. App. 3d at 728–29.

### B.   CARBON CREST WAS A "BROKER."

A broker is one who "helps to conclude the transaction by taking part in negotiating the details of the transaction." *Tyrone v. Kelley*, 9 Cal. 3d 1, 12 (1973). "The law is established that if a broker takes any part in the negotiations, no matter how slight, he is not a middleman but is a broker." *Abrams v. Guston*, 110 Cal. App. 2d 556, 557–58 (1952). But "an unlicensed individual may recover an agreed compensation where he merely finds a buyer, seller, lender, or borrower . . . ." *Tyrone*, 9 Cal. 3d at 11. "[T]he distinction between the finder and the broker frequently turns upon whether the intermediary has been invested with authority or

duties beyond merely bringing the parties together, usually the authority to participate in negotiations." *Id.* at 9.

Here, Carbon Crest was a broker within the meaning of the Business and Professions Code.  Under the Sales Process Advisory Agreement, four of six duties assigned to Carbon Crest involved negotiating a sale with a potential buyer (TX 36).  Thus, Carbon Crest was "invested with authority . . . beyond merely bringing the parties together." *Tyrone*, 9 Cal. 3d at 9.  Moreover, like the banking firm in *All Points*, Lewis was actually "involved in the negotiation" of a potential stock sale (Tr. 298).  That Lewis identified prospective purchasers does not make him an exempt "finder" because he went beyond the reach of the exception by participating in negotiations — as did the banking firm in *All Points*.  Thus, Lewis and Carbon Crest constituted a broker under Business and Professions Code Section 10130.

### C.    THE LICENSING STATUTE APPLIES REGARDLESS OF WHETHER CARBON CREST ACTED "WITHIN THIS STATE."

The licensing statute prohibits an unlicensed broker from acting "within this state." Cal. Bus. & Prof. Code § 10130.  Neither the California judiciary nor our court of appeals has expressly defined "within this state."  The California Department of Real Estate, however, has issued an advisory opinion defining the phrase.[1]

Yet our court of appeals has found that California would allow a broker who was unlicensed in California to recover for services relating to property located in California so long as (1) the broker did not perform any services in the physical area of California, and (2) the broker had a broker's license at the time of the services and from the state where he performed the services.  *Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1151 (9th Cir. 1986) (citing *Cochran v. Ellsworth*, 126 Cal. App. 2d 429, 438 (1954)).

Here, neither Carbon Crest nor Lewis has ever had a California broker's license or its equivalent from any other jurisdiction.  Thus, under *Consul*, even if Lewis did not perform any

---

[1]  Wayne S. Bell, *Advisory — What Constitutes Engaging in Real Estate Licensed Activities "Within this State" Requiring a Real Estate Broker or Salesperson License?* (July 2012), available at https://www.dre.ca.gov/files/pdf/Within_this_State_Advisory.pdf.

19

broker work "within this state," his lack of licensure from the states where he performed the services precludes recovery.  802 F.2d at 1151.  No California state decision or Ninth Circuit decision allows this order to conclude otherwise.

### D.   THE SALES PROCESS ADVISORY AGREEMENT WAS VOID AND INCAPABLE OF SEVERANCE.

"A contract to perform acts barred by California's licensing statutes is illegal, void and unenforceable."  *Consul*, 802 F.2d at 1148 (citing *Est. of Baldwin*, 34 Cal. App. 3d 596, 604 (1973)).  Thus, because Carbon Crest (and Lewis) did not have a broker's license in any state and performed broker work relating to a business opportunity for a California entity, the Sales Process Advisory Agreement was void.  Cal. Bus. & Prof. Code § 10130.

The doctrine of severability cannot save Carbon Crest.  California Civil Code Section 1599 states, "[w]here a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest."  "A contract that does not allocate consideration between lawful and unlawful services but instead provides for a single, undifferentiated payment for all services provided does not necessarily preclude severance.  Severance may be available if some of the services provided are wholly independent of the unlawful object."  *MKB Mgmt., Inc. v. Melikian*, 184 Cal. App. 4th 796, 803 (2010).  If a contract is capable of severance, a trial court has discretion to sever based on equitable considerations.  *Ibid.*  Civil Code Section 1598 provides, however, "[w]here a contract has but a single object, and such object is unlawful, whether in whole or in part, or wholly impossible of performance, or so vaguely expressed as to be wholly unascertainable, the entire contract is void."

Here, the Sales Process Advisory Agreement was incapable of severance.  The contract had but a single, unlawful object:  to sell Tencue.  Four of Carbon Crest's six duties under the agreement called for Carbon Crest to negotiate favorable terms of sale, which is unlawful to do without a broker's license under the Business and Professions Code.  Further, Carbon Crest's remaining duties to "evaluate other potential buyers" and to "manage the sale process" were not "wholly independent of the unlawful object."  *MKB*, 184 Cal. App. 4th at 805.  But for the

unlawful object of selling Tencue, Lewis would not have evaluated potential buyers or managed the sale process.  Thus, Carbon Crest cannot recover via the doctrine of severability.

### 3.  CHOICE-OF-LAW.

Carbon Crest contends that Delaware law should apply given the contract provision to that effect.  Carbon Crest contends, therefore, that the licensing statute does not apply.

Because this court sits in California for this diversity matter, it applies California's choice-of-law rules to determine the controlling law.  *Patton v. Cox*, 276 F.3d 493, 495 (9th Cir. 2002).[2]  When the contract at issue has a choice-of-law clause, California's choice-of-law rules require application of Restatement (Second) Conflict of Laws Section 187:

> [A] California court begins its analysis by determining "whether the chosen state has a substantial relationship to the parties or their transaction, or . . . whether there is any other reasonable basis for the parties' choice-of-law."  If this is the case, the court then determines whether California would "be the state of the applicable law in the absence of an effective choice-of-law by the parties."  If the chosen forum has a substantial relationship to the parties or their transaction but California law would apply in the absence of a choice-of-law provision, the court then determines whether the relevant portion of the chosen state's law is contrary to a fundamental policy in California law.  If there is such a conflict, the court finally determines whether California has a "'materially greater interest than the chosen state in the determination of the particular issue . . . .'"  If all of these criteria are met, the court applies California law.  Otherwise, the court applies the law of the forum selected in the contract.

*First Intercontinental Bank v. Ahn*, 798 F.3d 1149, 1153–54 (9th Cir. 2015) (citations omitted). The following factors in Restatement Section 188 determine whether California would be the state of applicable law absent a choice-of-law clause:

> (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the domicil, residence, nationality, place of incorporation and place of business of the parties.

*Id.* at 1154.

---

[2]  Although the parties agreed not to give effect to choice-of-law principles, no California or Ninth Circuit decision has ignored all choice-of-law principles on the basis of a contractual provision. *See In re Sterba*, 852 F.3d 1175, 1181–82 (9th Cir. 2017) (Tashima, J., concurring).

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Here, under Restatement Section 187, Delaware has a substantial relationship to Carbon Crest, which was incorporated in Delaware when the Sales Process Advisory Agreement was executed. *Nedlloyd Lines B.V. v. Super. Ct.*, 3 Cal. 4th 459, 466 (1992).

Moving to Restatement Section 188, California was the place of contracting, and the location of the subject matter of the contract (Tencue) was California. Thus, two factors weigh in favor of California. Only one factor weighs against California — Lewis performed nearly all work under the agreement outside of California. The remaining two factors are neutral because Wilk negotiated the agreement in California while Lewis did so in New York, and Tencue was incorporated in California while Carbon Crest was incorporated in Delaware. Thus, California law would apply absent the choice-of-law provision. Moreover, the internal affairs doctrine would likely dictate the same conclusion. *See Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

This order next considers whether Delaware law conflicts with a fundamental policy in California law. In California, "'[t]he purpose of . . . licensing requirements is to protect the public from incompetent or untrustworthy practitioners.'" *Salazar*, 152 Cal. App. 4th at 1036 (citation omitted). Moreover, "[t]he promotion of competency and integrity in those called upon by the public to perform complex duties involving trust is a salutary purpose, and the policy underlying the licensing statutes must be given full effect." *Tyrone*, 9 Cal. 3d at 12. Thus, protecting the public from unlicensed practitioners is a fundamental policy in California embodied by Business and Professions Code Section 10130. But Delaware does not have a licensing statute like Section 10130 that would apply here. *See* Del. C. §§ 2901, 2902 (not prohibiting unlicensed acts related to business opportunities). Thus, Delaware law conflicts with a fundamental policy in California law.

California's interest in enforcing its law is materially greater than that of Delaware because California's interest is to protect a resident corporation from untrustworthy practitioners, and Delaware's interest is only the "more general interest in enforcing the provision[] of [a] contract[] made by one of its citizens." *Brack v. Omni Loan Co.*, 164 Cal. App. 4th 1312, 1329 (2008). Thus, this order shall apply California law.

This order rejects Carbon Crest's assertion that the absence of an anti-waiver provision in Business and Professions Code Section 10130 means the statute does not embody a fundamental public policy. Although an anti-waiver provision is one consideration, the California Supreme Court has stated that laws also embody fundamental public policies when they "protect against otherwise inequitable results" or they "promote the public interest." *Pitzer Coll. v. Indian Harbor Ins. Co.*, 8 Cal. 5th 93, 103 (2019). Section 10130 protects the public from unlicensed practitioners to avoid inequitable results, thereby promoting the public interest. Section 10130, therefore, embodies a fundamental public policy even absent an anti-waiver provision.

### 4.   INTERESTED DIRECTOR TRANSACTION.

The foregoing is sufficient to invalidate the agreement, but there is a second reason as well. California Corporations Code Section 310 provides, in part:

> (a) No contract or other transaction . . . between a corporation and any corporation . . . in which one or more of its directors has a material financial interest, is either void or voidable because . . . such other corporation . . . [is a] part[y] . . ., if
>
> (1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the shareholders and such contract or transaction is approved by the shareholders (Section 153) in good faith, with the shares owned by the interested director or directors not being entitled to vote thereon, or
>
> (2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested director or directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified, or
>
> (3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified.

Section 153 of the Corporations Code states that "'[a]pproved by (or approval of) the shareholders' means approved or ratified by the affirmative vote of a majority of the shares represented and voting at a duly held meeting at which a quorum is present . . . ."

1    Here, Tencue entered into the Sales Process Advisory Agreement with Carbon Crest.

2    The sole owner of Carbon Crest was Lewis, a director of Tencue.  Thus, one of Tencue's

3    directors had a material financial interest in a company with which Tencue contracted.  The

4    Sales Process Advisory Agreement was, therefore, void unless saved by Section 310.

5          Notwithstanding that everyone knew that Wilk, alone, made major decisions for Tencue,

6    neither the directors nor the shareholders of Tencue held an affirmative vote approving the

7    Sales Process Advisory Agreement.  Moreover, Carbon Crest has not identified any decision

8    allowing ratification of a transaction under Section 310 without a vote.  And, although Carbon

9    Crest cites Delaware law allowing delegation of board authority, "California has recognized

10   the rule that the board cannot delegate its function to govern." *Kennerson v. Burbank*

11   *Amusement Co.*, 120 Cal. App. 2d 157, 173 (1953).  Thus, the Sales Process Advisory

12   Agreement was void as an interested director contract, and Section 310 cannot save it.

13        **5.   QUASI-CONTRACT CLAIMS.**

14        The contract was void and cannot be enforced, but that does not mean that the Court

15   cannot grant some relief to plaintiff to avoid an unjust result.  In reliance on Wilk's written

16   word and signature, Lewis did excellent work to position the company for an eventual sale at

17   twice the amount Wilk had been willing to accept.  All agree that Wilk remained free to reject

18   the Nth Degree offer of $37.5 million.  But that offer nevertheless demonstrated that Lewis had

19   been right in advising against the earlier $20 million and $25 million offers, and that Lewis had

20   done fine professional work to position Tencue for a much better price.  In fact, more than

21   anyone else in this tale of greed, Lewis deserves credit for putting Tencue in a position to fetch

22   a better price.  True, Lewis had no role in the subsequent negotiations with Opus Agency,

23   having been excluded by defendants.  But, by that point, Lewis had already done the hard

24   work.  Opus Agency offered $40 million.  Confident in the position Wilk found himself by

25   virtue of Lewis' work, Wilk asked for $42 million and got it.  But when it came time to honor

26   his word to Lewis, Wilk reneged and interposed points of law, points this order feels obliged to

27   uphold but reluctantly.

28

United States District Court
Northern District of California

True, "[t]he rule that the courts will not lend their aid to the enforcement of an illegal agreement or one against public policy is fundamentally sound." *Norwood v. Judd*, 93 Cal. App. 2d 276, 288–89 (1949). "The rule was conceived for the purposes of protecting the public and the courts from imposition." *Id.* at 289. But, "[i]n compelling cases, illegal contracts will be enforced in order to 'avoid unjust enrichment to a defendant and a disproportionately harsh penalty upon the plaintiff.' 'In each case, the extent of enforceability and the kind of remedy granted depend upon a variety of factors, including the policy of the transgressed law, the kind of illegality and the particular facts.'" *Asdourian v. Araj*, 38 Cal. 3d 276, 292 (1985) (citations omitted) (cleaned up). Further:

> [T]he courts should not be so enamored with the latin phrase 'in pari delicto' that they blindly extend the rule to every case where illegality appears somewhere in the transaction. The fundamental purpose of the rule must always be kept in mind, and the realities of the situation must be considered. Where, by applying the rule, the public cannot be protected because the transaction has been completed, where no serious moral turpitude is involved, where the defendant is the one guilty of the greatest moral fault, and where to apply the rule will be to permit the defendant to be unjustly enriched at the expense of the plaintiff, the rule should not be applied.

*Norwood*, 93 Cal. App. 2d at 289.

In *Epstein v. Stahl*, the parties entered into a contract whereby the plaintiff was to "'provide for all labor and materials . . . and . . . supervise all labor and construction'" of several apartment buildings. The defendant provided all funds necessary for the construction. Although the plaintiff performed all services required of him under the contract, the defendant refused to pay the plaintiff pursuant to their agreement. The plaintiff was not a licensed contractor. The defendant contended that the plaintiff could not recover because a California licensing statute made it unlawful for any person to, "'himself or by or through others, construct, alter, repair, [or] add to . . . any building'" without a license. Yet the court allowed the action to continue over the defendant's demurrer:

> Plaintiff invested his services, property, and money; defendant, his property and money. . . . In justice and equity [plaintiff] should not be precluded from recovering his just share of the profits of the venture. We do not think the statute precludes him from doing so.

25

1

\*          \*          \*

2        The purpose of the legislation is to deter unlicensed persons
3   from engaging in the contracting business and to protect the public
    from dishonesty and incompetence in the administration of that
    business.  The statute was not intended as an unwarranted shield
4   for the avoidance of a just obligation, the clear purpose for which
    defendant seeks to employ it.  The rule that an agreement which
5   violates a statute enacted for the protection of the public is void
    and unenforceable is not applied when to do so does not serve the
6   intended purpose of the statute.

7   176 Cal. App. 2d 53, 55–63 (1959).

8        In *Cochran v. Ellsworth*, a real estate broker contracted to sell property for a commission.

9   *Cochran* used choice-of-law principles to avoid finding the contract illegal.  It cited other

10  decisions that did the same.  But underlying those decisions and *Cochran* itself were principles

11  of equity:  "Back of many of these cases is the desire of the courts to see that a broker is

12  compensated for services actually rendered pursuant to agreement."  "[B]y considering the

13  facts in each case individually, courts have found a way to render substantial justice."  126 Cal.

14  App. 2d at 431, 436–38.

15       Here, the findings of fact show this is a "compelling case" justifying quasi-contractual

16  recovery.  *Asdourian*, 38 Cal. 3d at 292.  Lewis' services under the Sales Process Advisory

17  Agreement significantly benefited Tencue by upgrading Tencue and positioning it for

18  favorable sale.  In fact, Tencue's board stated the following in emails to Lewis:

19  - "Your participation has been a tremendous asset over the last few years . . . ."

20  - "Your work over the past years has been very valuable to us . . . ."

21  - "[We] appreciate all the work you have done for us in the past few years. . . .

22  [W]e have enjoyed working with you . . . ."

23  The evidence provides overwhelming support for these statements.

24       *First*, Wilk rejected the initial $20 and $25 million offers from Opus Agency only

25  because Lewis recommended that he do so.  But for Lewis' recommendation, Wilk would have

26  accepted, and he would not have later received the $37.5 million and $42 million dollar offers

27  from Nth Degree and Opus Agency.  Tencue would have sold for much less than its eventual

28  value on sale to Opus Agency.

United States District Court
Northern District of California

26

1      *Second*, Lewis was responsible for introducing Nth Degree to Tencue.  But for Lewis'

2   introduction and affirmation that working with Nth Degree would be "helpful from a

3   process/valuation standpoint," there would not have been sale discussions between Nth Degree

4   and Tencue.  Nth Degree would not otherwise have, in Wilk's own words, "establish[ed] a

5   baseline valuation" for Tencue.

6      *Third*, Lewis recommended that Tencue hire a banking partner, and Lewis arranged for

7   AdMedia to fill that role.  AdMedia supported the sale process and negotiations, and it hosted

8   meetings between Tencue and potential buyers at its office in New York.

9      *Fourth*, Lewis performed an overlay conversion to conform Tencue's accounting system

10  to Generally Accepted Accounting Principles.  This painstaking conversion made Tencue

11  respectable and more appealing to potential buyers.

12     *Fifth*, Lewis prepared information memoranda to present to potential buyers regarding

13  Tencue's financials.  Lewis also prepared a confidential information memorandum specifically

14  for Nth Degree.

15     *Sixth*, Lewis encouraged Tencue to discuss cultural fit with potential buyers.  Lewis

16  arranged meetings for that specific purpose.  He even prepared Wilk and Leimkuhler for

17  roadshow meetings with potential buyers.

18     *Seventh*, Lewis managed the process, a process that involved numerous stressful steps.

19     Furthermore, allowing Lewis to recover would not conflict with the "policy of the

20  transgressed law." *Asdourian*, 38 Cal. 3d at 292.  The California licensing statute serves to

21  "'protect the public from incompetent or untrustworthy practitioners.'"  *Salazar*, 152 Cal. App.

22  4th at 1036.  But Lewis was not such a practitioner.  Lewis' significant contributions to

23  Tencue's value demonstrate he was competent.  Defendants have not shown Lewis to be

24  untrustworthy.  And, Lewis' willingness to manage the sale process, against his own desire of

25  acquiring Tencue, shows that he was loyal to the company.

26     Moreover, California courts have found that equitable considerations outweigh "the kind

27  of illegality" present here. *Asdourian*, 38 Cal. 3d at 292.  Like in *Epstein*, in which the

28  plaintiff did not have a contractor's license but performed all services required of him under a

contract, here, Lewis did not have a broker's license but performed all services required of him under the Sales Process Advisory Agreement. Both the plaintiff in *Epstein* and Lewis showed that they were competent and trustworthy. And, the licensing statute here "was not intended as an unwarranted shield for the avoidance of a just obligation, the clear purpose for which defendant seeks to employ it." *Epstein*, 176 Cal. App. 2d at 63. "[N]o serious moral turpitude [was] involved" on the part of Lewis, and Wilk, having reaped the benefit of Lewis' hard work and then having reneged on his word, "is the one guilty of the greatest moral fault." *Norwood*, 93 Cal. App. 2d at 289. Thus, this order finds that, in the interest of rendering "substantial justice," Carbon Crest is entitled to recover, not under the contract, but in quasi-contract. 126 Cal. App. 2d at 436.

Likewise, equity allows this order to excuse the interested director transgression, namely, the lack of shareholder approval. Tencue adopted a pattern and practice of Wilk making all significant decisions. Lewis simply followed the pattern and practice that Wilk and Tencue had themselves shown was acceptable. Tencue was not tricked or misled. Again, while the contract will not be enforced, equity demands that Lewis receive compensation in quantum meruit for the value of his services. Lewis conferred significant value on Tencue and the shareholders, and they cannot, in good consciousness, complain that Lewis followed the very procedures held out by Tencue as normal.

Defendants argue that Carbon Crest cannot recover on its claim for unjust enrichment because unjust enrichment is not a cause of action. *Hill v. Roll Int'l Corp.*, 195 Cal. App. 4th 1295, 1307 (2011). But California courts "ignore 'erroneous or confusing labels . . . if the complaint pleads facts which would entitle the plaintiff to relief.'" *McBride v. Boughton*, 123 Cal. App. 4th 379, 387 (2004) (citation omitted). As *McBride* stated:

> "Quasi-contract" is simply another way of describing the basis for the equitable remedy of restitution when an unjust enrichment has occurred. Often called quantum meruit, it applies "where one obtains a benefit which he may not justly retain. The quasi-contract, or contract 'implied in law,' is an obligation created by the law without regard to the intention of the parties, and is designed to restore the aggrieved party to his former position by return of the thing or its equivalent in money."

United States District Court
Northern District of California

*Id.* n. 6 (citations omitted).  Thus, because unjust enrichment is a general principle underlying restitution (*i.e.*, quantum meruit), this order "construe[s] [Carbon Crest]'s cause of action for unjust enrichment as an attempt to plead a cause of action giving rise to restitution."  *Id.* at 387–88.  Moreover, Carbon Crest claimed quantum meruit in its complaint.

Defendants also contend that Carbon Crest cannot recover in quasi-contract because it has not presented a way to assess the value of the services rendered.  Defendants cite *Maglica v. Maglica*, 66 Cal. App. 4th 442 (1998), to support their contention.  But *Maglica* did not bar any quasi-contract claim for lack of a method of assessment.  *See ibid.*  It merely stated the rule that "the measure of recovery in quantum meruit is the reasonable value of the services rendered provided they were of direct benefit to the defendant," and it clarified that rule, stating "[t]he legal test for recovery in quantum meruit is not the value of the benefit . . . ."  *Id.* at 446, 449.  This order, however, does not intend to award the value of the benefit Lewis conferred upon defendants.  Rather, it shall award the reasonable value of Lewis' services.

And, contrary to defendants' assertion, there is a way to calculate the reasonable value of Lewis' services.  To compensate plaintiff in these circumstances, the Court finds that 1.5 million dollars is reasonable — it is a blend of two methods.  The first is to take four percent of the total $42 million as one benchmark.  That number is $1.68 million.  The second is to take five percent of the value added by plaintiff, which would be five percent of $22 million, or $1.1 million.  Both percentages are well within the normal percentages suggested by the defense.  One and a half million is in between the two benchmarks.  The defense's expert testified that fees are normally between one and five percent for a transaction of this size.

Thus, this order awards one and a half million dollars to Carbon Crest, LLC.[3]

---

[3] If only one side appeals and that appeal is unsuccessful, this order asks the court of appeals to consider raising or lowering, as the case may be, the award to account for the fees and expenses by the prevailing side on appeal or remanding for the district court to do so.

United States District Court
Northern District of California

1
2

### 6.    DEFENDANTS' COUNTERCLAIMS.

#### A.    CARBON CREST BREACHED ITS FIDUCIARY DUTY.

3

"The elements of a cause of action for breach of fiduciary duty are the existence of a

4

fiduciary relationship, its breach, and damage proximately caused by that breach." *City of*

5

*Atascadero v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 68 Cal. App. 4th 445, 483 (1998).

6

Directors owe fiduciary duties to their companies. *Diodes, Inc. v. Franzen*, 260 Cal. App. 2d

7

244, 249 (1968). Where a director enters into a contract with his or her corporation, the duty

8

of loyalty requires the director "'not only to prove the good faith of the transaction but also to

9

show its inherent fairness from the viewpoint of the corporation and those interested therein.

10

The essence of the test is whether or not under all the circumstances the transaction carries the

11

earmarks of an arm's length bargain. If it does not, equity will set it aside.'" *Burt v. Irvine*

12

*Co.*, 237 Cal. App. 2d 828, 851 (1965) (citation omitted).

13

Here, Lewis was a director for Tencue when he executed the Sales Process Advisory

14

Agreement on behalf of Carbon Crest. Thus, Lewis owed Tencue a fiduciary duty of loyalty.

15

The Sales Process Advisory Agreement grants Lewis approximately sixteen percent of the total

16

transaction value with Opus Agency. But normal rates for broker fees are between one and

17

five percent of the total transaction value. Thus, the fee structure of the agreement was

18

excessive and unfair to Tencue. Lewis breached his duty of loyalty.

19

Defendants' other theories for breach of fiduciary duty are meritless. Lewis did an

20

excellent job managing cultural fit issues and all other issues, and he facilitated direct

21

discussions with principals of potential buyers.

22

Defendants do not cite authority, however, for the proposition that they are entitled to

23

damages in addition to invalidating the agreement. Defendants have failed to show that Lewis

24

caused Tencue to expend over $160,000. Thus, defendants cannot recover for Lewis' breach

25

of fiduciary duty.

26

#### B.    CARBON CREST WAS NOT PROFESSIONALLY NEGLIGENT.

27

"The elements of a claim for professional negligence are: '(1) the duty of the

28

professional to use such skill, prudence, and diligence as other members of his profession

commonly possess and exercise; (2) a breach of that duty; (3) a proximate causal connection between the negligent conduct and the resulting injury; and (4) actual loss or damage resulting from the professional's negligence.'" *Paul v. Patton*, 235 Cal. App. 4th 1088, 1095 (2015) (citation omitted) (cleaned up).

Defendants' only ground for professional negligence is that Lewis did not do sufficient due diligence regarding Tencue's cultural fit with potential buyers. This is ridiculous. The evidence shows that he did an excellent job managing cultural fit and all other issues. Thus, defendants cannot recover under a theory of professional negligence.

## CONCLUSION

For the foregoing reasons, plaintiff shall recover **ONE AND ONE-HALF MILLION DOLLARS** from defendants. Defendants shall not recover.

**IT IS SO ORDERED.**

Dated:  April 11, 2022.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE